May it please the Court, Jaspreet Kaur Singh on behalf of Petitioner Cesar Tavares-Leite. I ask the Court to reserve five minutes of my time for rebuttal. Given the extensive briefing permitted by the Court, if it pleases the Court, I would like to begin with the post-briefing clarification offered by the government in their 28J letter with respect to their position of whether the Real ID Act Amendment amended Section 1231b3, the Withholding of Removal Statute, so that the one central reason nexus standard applies to applications of withholding of removal. The government is now clarifying its position that the issue is decided under Chevron's first step, which, as their 28J letter concedes, conflicts with the Board of Immigration Appeals' position that the statute is silent and thus ambiguous with respect to whether the one central reason nexus standard applies. As a result, the parties now agree that the application of Chevron's first step resolves the case. The government's argument rests on Real ID Act 101H2, which states, and I'll quote, the amendments made by subsections A3, B, C, and D shall take effect on the date of the enactment of this division and shall apply to applications of asylum withholding or other relief from removal made on or after such date. The government casts Section 101H2 as something more than setting forth an effective date for certain Real ID Act amendments. According to the government, 101H2 is clear expression of Congress's intent that the specific amendments attached to the statutory sections of asylum withholding and other forms of relief are universally applicable and interchangeable to all three forms of relief. The government's ambitious reading controverts the plain language of the statute. 101H2 refers to specific subsections of the Real ID Act. 101, and those subsections, they delineate with unassailable clarity that the substantive Real ID Act amendments, 101A3 and 101B amend Section 1158 of the, which is the asylum statute. 101C amends Sections 1231B3, which is the withholding statute, and 101D amends 1229A, the statute relating to other requests of, for relief of removal. There's nothing in 101H2 that suggests overriding Section 101's clear setting forth of the amendments to each statutory section or suggests that the 101 amendments are interchangeable. The only plausible reading of 101, Section, yes. Counsel, Judge Gould, if I could interpose a question, please. Yes, Your Honor. I think there's some force to your argument, but how do you address a prior opinion we have? I think it was written by Judge Tallman called Zatino, said 622F3rd 1007. Because I thought that in that decision, that panel held that the one central reason standard on the nexus text applied to withholding, and if they did do that, then our three-judge panel wouldn't really have an ability to change that. You'd have to present your argument to an en banc petition. So what, am I missing something on Zatino? Your Honor, there are some courts that have assumed, and in Zatino, the one central reason is the way the language of that case reads, if I'm remembering it correctly, they apply the one central reason standard, but they're talking both about asylum and withholding. There are a number of cases that talk about asylum and withholding around the one central reason standard, but the question presented here is not, has not been directly addressed by the court. Also, that would both do violence to a plain reading of the statute, as well as contradict the Supreme Court's opinion in Stavik and Cardozo-Fonseca. In Cardozo-Fonseca, it's very clearly stated that withholding is not tied necessarily to the definition of a refugee, and the one central reason amendment is plainly tying asylum to the definition of a refugee. Okay, counsel, I understand your argument. As I said, I think it has some force, but I'm still bothered, just so you understand my concern, that I thought that the language in Zatino was explicit. It didn't say it was an assumption. It said that the one central reason applied. I think so. Normally, at least I've felt, and you could address this if you wish, that we can't overrule prior panel opinion just because it's ill-considered or done. If opinion didn't say it was making an assumption. Yes, Your Honor, but also this Court — sorry. Go ahead. Okay. In Parasimova, in a footnote in Parasimova, the Court also — this Court actually addressed that the one — they were not deciding the one central reason. Judge Gould, are you able to hear us continuously? I could, but then it keeps freezing up. Wait a second. No, you can't do anything. Can you hear me now? Yes, Your Honor. There were a couple of places where the screen froze, and I think I wasn't hearing what was being said. What I was saying, Your Honor, is — I'm having my secretary call Kwame Copeland right now to see if they can do something about it. Your Honor, in a footnote in Parasimova, this Court specifically said that it was not making a ruling on the one central reason standard because it was different, but it wasn't being addressed there. And I think mentioning one central reason when addressing the asylum statute and addressing the withholding statute in Zatino doesn't — it — there wasn't a clarification being made there, and it's not a direct reading. I'm sorry, I don't have a quote, the quote of Zatino. I know it's in my brief, and I can pull it, but it's — the language is not clear there, in my opinion, that one central reason applies to withholding. Okay. Well, I had it in my notebook, but I don't have that in front of me now, so we can — you can address it further, and the panel can take a look at it. Thank you, Your Honor. I have it right in front of me. Oh, you do? Okay. Yeah. I mean, I know what you're saying. The one — there's one sentence. If you have the case, it's on page 11 — I'm sorry, 1015. It's that second full paragraph in the right-hand column, and I think the language that everyone is focusing on is the last sentence of that paragraph, and it's — you're right. The court first says, here's the asylum standard, here's the withholding standard, and then says at the end of that paragraph, the Real ID Act of 2005 places an additional burden on Zatino to demonstrate that one of the five protected grounds will be at least one central reason for his persecution, but then it cites the asylum statute, 1158. Yes. So I think some of us, and I'll put myself in this camp at least initially, read that last sentence as applying to both the two earlier sentences, which covered asylum and withholding. Yes, Your Honor. But I think your argument is simply that you can't really tell that there was any specific holding with respect to the withholding statute because it's ambiguous in the court there cited the asylum statute. That's right, Your Honor. And, you know, I think the plain language reading and Congress's intent as well — if you look at the conference report around that time, they have a very clear discussion. It's a conference report. It's 109-72. They have a very clear discussion about what asylum is, what withholding is, and then they clearly delineate which of the amendments of the Real ID Act are applying to the various sections. And the only two are credibility and corroboration. That they apply to withholding. Yes, Your Honor. Following up on what Judge Watford just said, and I reread that section of Citino about five times following your argument, assuming I agree with you as well. The other problem that we have, aside from the Ninth Circuit binding decision in Citino, the First Circuit, the Fifth Circuit have also published opinions making the very same assumption. So are you asking us to go against those as well? Your Honor, I think we really have to let Chevron control and also Cardozo, Fonseca, and Stevic because in those decisions, it's much more clearly stated what relief withholding is and that we are actually — the U.S. is trying to stay in compliance with its obligations under 33.1 of the Convention on Refugee Status. And if we are — I'll give an example of why I don't think the one central reason standards should necessarily apply as it would in asylum. Asylum is a discretionary form of relief. It has many higher bars. And it's very true that the Real ID Act was trying to make the standard much more onerous. But withholding is — it is a mandatory form of relief, but it does not grant the same kind of rights to an individual if they are granted withholding. They're essentially only able to stay here and work until the situation in their country improves. Now, if we were — let's take the case of someone who's in — who was here visiting from Syria before the conflict there started. If that person — the conflict started and they're Shia, which means they are under the — they're part of the government party and they're not part of the majority. That person is now — they're not eligible for some reason or another for asylum. The Attorney General, in their discretion, decides that they would not grant that individual asylum. Now, if they go back to their village, they may face — their one central reason could be that their village is Sunni and they feel like they will face that conflict under religion. But if they go back and they're arrested by the government because they're American, or I mean because they visited America, that could be a wholly different — they're going to be investigated for that and probably tortured, et cetera. And that's not necessarily a protected ground. So an asylum adjudicator, when presented with that person, may say, okay, well that more onerous one central reason standard that applies to asylum, we can't grant them that. But we do see that they have a more likely than not, a 50 — more than 50 percent chance that they're going to be, you know, persecuted, either by the one central reason on a protected ground or — but is it possible to really determine which one is more central than the other? It's — you know, it could be in part one way or the other. So, yes, Your Honor. Even assuming we agree with that reasoning, don't we have the same problem as we did in the previous criminal case, procedurally here? One — three judge panel can't overrule Latino? Your Honor, the — if you — if we read the statute, though, the statute's very clear that it says it's different than the other case. I don't — didn't study the other case, of course. But the language in the statutes are different. 11-58, which is the asylum statute, says on account of. And the withholding statute says because of. And because of has traditionally been, you know, looked at as an in part reading. And one central reason is a more onerous standard. But for — to meet withholding, they're already having to meet an onerous standard of more likely than not fear of persecution. So to ask then, on top of that, to say, well, the — it has to be one central — I mean, I — we fully believe that Mr. Laite would meet the grounds on one central reason or in part. It's very — the evidence in the record is incredibly clear for Mr. Laite that political opinion and — that he needs both a test for political opinion and social group in terms of one central reason. But a plain language reading of the statute, as well as the intent, if you look at congressional intent, and, you know, we — the BIA's reading here can't overturn statute or congressional intent. Let me ask you a follow-up on the last point that you made. Even in view of the Real ID Act, does the BIA have discretion to interpret the phrase because of? The — I think that we — generally under Chevron, you really have to look at what the plain language is. And the plain language of because of has really been interpreted as a relevant consideration. And that's — it's a relevant consideration to the application. This Court previously ruled that the BIA should give its thoughts on one central reason, as well, and the meaning of that. So I think that that's in the discretion of the Court to ask the BIA to do that. But I think that a clear reading of the congressional — of the statute, as well as the congressional intent, should be that it's — it doesn't — sorry, I'm very close to my time. You're actually over it, but we will give you a couple minutes for rebuttal. Oh, thank you. Let's hear from the government now. Good morning. Good morning, Judges. May it please the Court, Sharon Kling on behalf of the government. Can you be sure to keep your voice up a little so that Judge Gould can hear you? Okay. Pursuant to the 28J letter that I forwarded to this Court, government argues that Section 101H2 does, in fact, explicitly provide that the amendments made by subsection 101A3 do establish that the one central reason applies to withholding of removal claims. To Counselor's point about the Chevron one-step and two-step, the reason why there's a disjunction between the two cases, whether or not there's a Chevron one or two apply, is because the 28J letter explicitly describes what's going on in Real ID Act. When the board was asked to determine whether or not the statute was silent or whether it expressly adopted a central reason standard, the remand specifically told the board to address sections 208B1BI. In that, they requested under 208 and not necessarily the Real ID Act, the board began its evaluation or its construction of the statute based on the INA and not the Real ID Act. That explains the difference between whether or not Chevron one or one or two has actually been applied. That said, to the extent that the Court does not find that the 28J letter was persuasive, the board did actually determine that the one central reason standard applied, and it was permissible under statutory construction. The board examined the plain language of section 208A1BI and found that the, well, not 208, 241B3A. It does not expressly state or adopt a central reason standard. However, the court, this Court has actually found that silence is not conclusive of whether or not the intent is clear. The board was entitled to look at the, the board was entitled to take a look at the intent of the Real ID Act, the legislative history, the overall statutory scheme, as well as applied common sense in coming to its determination that it did apply. Can I ask you just to maybe segue to a different topic on Cetino? Yes. Following up on Judge Gould's question to your opponent, are you arguing that we've already decided, we, the Court, has already decided this question and we should just look at Cetino and stop? Yes. I, we are arguing that the Court has decided that I've looked at the Cetino case. So just point to me the language, what's the language in Cetino that you rely on? Well, I, it's not explicit, but even since the holding in Cetino, this Court has actually taken the issue up. And in Lee v. Holder in 2011, the Court actually explicitly said that the heightened standard applied to withholding and removal claims. And as recently as 2014, the Court has actually applied the standard in Gill v. Holder. Now, neither of those cases are precedential, but the Court has actually acknowledged. Oh, those are unpublished decisions? Yeah, these are unpublished. Oh, okay. Lee v. Holder, where they actually explicitly said the heightened standard applied to withholding, and Gill v. Holder, in which they actually applied the heightened standard. Well, obviously, well, okay. I mean, you're not bound by those decisions, no, but it's persuasive as to what this Justice has said. They're unpublished. They're unpublished. As you say, we're not bound. We could look at it if it's persuasive. Right. And I'm really, I'm to just look at the language myself of Cetino and ask whether it's sufficiently ambiguous that a three-judge panel can disregard it. And also, I know the Fifth Circuit and First Circuit had made similar holdings or statements. Are there any others? Just the Fifth and the First Circuit, as far as I know. But that aside, there are other reasons why the Court should look at this particular standard and determine or find that it was meant to apply to withholding or removal. It's not just based on the intent of the REAL-ID Act itself, but in past cases, the standard had been equally applied to both asylum and withholding or removal claims. When we deny an asylum application for failing to meet a lesser burden of proof, we automatically or necessarily determine that the withholding or removal claim has not been met. You're talking about pre-REAL-ID Act cases where we construed the two standards to be the same. Right. But again, we have Right. But the standard applied then was in part, and it was applied equally to both the asylum and withholding or removal. I know, but that's pre-REAL-ID Act. And then along comes Congress, and it amends the statute in a way that's just highly peculiar if Congress really intended what you're saying, that the two standards were supposed to be the same going forward. Correct. Under INA alias Zacarias, the Supreme Court has actually held, if you look specifically at the nexus requirement, the on-account-of and the because-of phrases are actually equivalent and have been used interchangeably, pre-REAL-ID as well as post-REAL-ID. As for the fact that the Section 208A1BI doesn't appear in the withholding or removal statute, the board, when it was talking about the legislative history, hit on the fact that, yes, the one central reason standard refers to the definition of refugee. And because the definition of refugee is a lesser burden required than withholding or removal, likely it would be problematic to reference the definition of refugee with the withholding or removal provision, because then there would be some question as to whether or not the overall burden of proof may have changed. So that said, I would argue that Section 208A1BI was explicitly left out of the withholding or removal provision to prevent confusion over the overall burden of proofs that are different between the different standards. Pre-REAL-ID and post-REAL-ID, I'm sorry, pre-REAL-ID and post-REAL-ID, the court has actually also defined applications for asylum as applications for withholding or removal, because they treat one, they treat, because you can't have one without the other, or you can't have one without the other. When you file an asylum application, it is, it does include an application of withholding or removal. The problem with going by a counselor's position is that if we were to apply different standards between the two different, the asylum and withholding or removal, you would probably, you would create a bifurcated analysis system just on a basic, a simple sub-issue. Also persuasive is the fact that the language hasn't changed. The pre-REAL-ID Act and post-REAL-ID Act actually still continue to use the term on account of and because of the heightened standard that's been applied to the definition of refugee was a signal to asylum applicants that this is the new standard. And like I said, it's likely that the referencing of the definition of refugee with the withholding statute or provision probably would create some confusion as to the overall burden of proof. How do you respond to your opponent's argument that there actually would be good reason for Congress to have a heightened standard apply to asylum, but not have it apply to withholding, given the different, the different nature of those two forms of relief? Well, but on the other hand, if you actually have a lower burden, evidentiary burden of proof for withholding or removal, people who are barred for eligibility for asylum, who aggravated felons or people who may have engaged in other barred activities abroad would have an easier time at establishing persecution by just simply making a tenuous connection between the act and the harm that he was suffered from, which I don't think that the board or the Congress had intended that people who are barred for asylum or barred for eligibility of asylum would have an easier opportunity to establish the evidentiary burdens for withholding or removal. I mean, I understand the overall burden is higher, but the onus on protection of citizens from their own government is narrowly addressed to the nexus requirement. It's not the overall burden itself, because one statute is discretionary and the other is mandatory. The nut and bolt for asylum for us is the nexus requirement, which it wouldn't make sense to allow one person to have to have as a central reason. And the other one, it just could be just tenuously attached to some kind of basis for relief. With regard to the second section, the well, getting back to opposing counsel's statement about whether or not he would meet the burden of proof under the previous standard, actually, the board in matter of CTL said that he wouldn't have met the burden under either standard. That said, what the board did conclude on the issue of the petitioner's actions is that with regard to his former employer, the former employer was retaliating. There was no intent to expose or publicize the government corruption at all. In fact, if you go through the transcripts, what the petitioner actually said was he was having these casual discussions with friends of his, in which he was just sort of the go-to person people went to talk to because he was the driver for the gentleman. And there was this publicized case in which the person was being implicated or investigated for the murder. And he likely, as the driver, may have some insightful information as to whether or not that was true. Based on his particular statements, you wouldn't assume that he was intending to incite some kind of, or make a statement about, or make an indictment against the government. Well, what about his run-ins with the police officers who tried to recruit him into that scheme? That seems to be, he was pretty out there in trying to expose their corruption. And why wouldn't that qualify? Well, the important question about whistleblowing is that whistleblowing has to be looked at in the context in which it's made. In this particular case, the whistleblowing was directed for aberrational acts. It was not directed to the government per se. The other evidence in the record that would tend to go against Petitioner's claim is that once the complaint was made, his client had been suspended from the government, which tells us that the government did not condone or sanction the actions of these police officers. The other thing that the Petitioner also mentioned was that the harassment started after the suspension. There was no harassment when the initial complaint was made, because one of the things he did say was that when I filed a complaint, he didn't do anything about it. But the reality is that harassment didn't start until after the officers had actually suffered some kind of penalty for their actions. The other point I want to make about that is that Petitioner has testified that he does not have a political opinion. He doesn't really understand politics. The other thing that needs to be addressed is that his appearance or the appearance of the story on TV, he explicitly testified that the reason that he went on television was not because he was trying to expose anti-government corruption, but because he wanted to prevent retribution, and that was his own admission. The idea about the X9 and the definition of being labeled a snitch doesn't lend itself to Petitioner's claim, because when he describes being labeled a snitch, X9, he didn't say it was a term of art of police officers and that they use it within their own confines to kind of label individuals. What he said was X9 was sort of a term that was used by everyone generally in Brazil. That's what you refer to as people who report on other people. There was no description as to who's reporting on who. Is it specifically people who are reporting against the government? Is it, you know, is it based on the FDA? I mean, there's no actual evidence, circumstantial or direct, that would tell you that snitching has something to do specifically with the police officers' actions. I did also want to address the Petitioner's comment about the violence, like systemic violence in Brazil. In his brief, he mentioned that the board in matter of CTL did not address the systemic problems in Brazil. However, the board in matter of CTL actually stated that he was relying on his underlying decision with regard to the issues that he wasn't addressing explicitly in matter of CTL. If you look at the board's previous decision, what the board said is that the problems that were in Brazil were varied state to state. And that Brazil was a very large country with lots of area between the states in which a person could actually escape from whatever was the ill in that particular state. If you go through the actual record and you review a lot of the Department of State reports, what you find is that the majority of all the problems that are occurring in Brazil are actually happening in Sao Paulo and Rio de Janeiro. Petitioner testified that he was from Bahia and that that was where he was from. In the Department of State reports, what it shows is that Bahia, unlike Rio de Janeiro and Sao Paulo, actually had initiatives where they were dismantling death squads and they were very successful in it. The other thing about death squads is that death squads, not to get beyond myself, but death squads usually executed criminals or persons who were for social cleansing purposes or they had death by resistance. So it was more geared towards the prisoners or arrests or those types of things. There's no evidence in this record that Petitioner is potentially subject to arrest. They clearly had enough time to arrest him or do other things besides point at him for the time that they were actually harassing him. The fact that Petitioner has been able to remain within Brazil, even for nine years after his former employer threatened him, cannibalized his claim overall that he's actually fearful of his life. His willingness to actually go to authorities seeking their assistance does not suggest that there's some kind of anti-corrupt sentiment. And actually he testified in the, when he was testifying about his dantes and the party that he belonged to, he actually said that that was the predominant party in the area and that everybody loved them. So it wasn't that anybody was fearful of, you know, his dantes regime or anything like that. But if anybody has any questions, I'll be willing to take one. But otherwise, I would just like to state that the board did apply the correct legal standard when it determined that Mr. Petitioner's political opinion or imputed otherwise is or was a central reason for his persecution. And he has actually failed to present any evidence to compel a contrary conclusion. Okay. Thank you, counsel. Appreciate your argument. And we'll give you two minutes for a rebuttal. Thank you, Your Honor. There are a lot of things that counsel brought up that I'd like to address. But firstly, in regards to Mr. Dantas, the reporting he did resulted in Mr. Dantas actually losing his next election. And that's why he was issuing death threats. Later, when he moved away from Dantas' area to Goyna, he reported on those police officers. And it's very clear in the human rights reports in the record and even as of last year, Human Rights Watch released a report talking about extrajudicial killings by police. It's a massive problem in Brazil. They kill five to ten people every day extrajudicially. And when you're targeting police or you're reporting on police directly and the robbery and death department does nothing about it, and then you appear on television and they suspend the officers for two months and then the death threats increase. That's clear. It's very clear that that's the political opinion he was that he would qualify under political opinion. In terms of the BIA's silence argument, I'd like to quote Cardozo-Fonseca. It says, where Congress includes particular language in one section of a statute but omits it in another section of the same act, it is generally assumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion. Congress, and it's very clear in the discussion, they did not apply 101A to withholding. They applied, or sorry, 1158, the subsection 1. They applied the standards for corroboration and credibility to withholding. And that's, I mean, I think it's very clear in this case that the court should really be looking at the plain language and looking at Congress's intent and what withholding is supposed to do. Okay. All right. Thank you very much. Thank you, Your Honor. The case just argued will stand submitted.
judges: Martinez, Gould, Watford